IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 16- |
| v. | : | DATE FILED: |
| CLARENCE VERDELL | : | VIOLATIONS: |
| ROCHELLE WILLIAMS-MORROW | | 21 U.S.C. § 846 (conspiracy to distribute |
| | : | controlled substances – 1 count) |
| | | 18 U.S.C. § 1349 (conspiracy to commit |
| | : | health care fraud- 1 count) |
| | | 21 U.S.C. § 841(a)(1) (distribution of |
| | : | controlled substances – 8 counts) |
| | | 18 U.S.C. § 1957 (money laundering – 2 |
| | : | counts) |
| | | 18 U.S.C. § 1347 (health care fraud – 2 |
| | : | counts) |
| | | 18 U.S.C. § 2 (aiding and abetting) |
| | : | Notices of forfeiture |

INDICTMENT

COUNT ONE

THE GRAND JURY CHARGES THAT:

At all times material to this indictment:

BACKGROUND

A.      **Prescriptions for Controlled Substances**

1.      The Controlled Substances Act governs the manufacture, distribution, and

dispensing of controlled substances in the United States.   Under the Controlled Substances Act,

there are five schedules of controlled substances, Schedules I, II, III, IV, and V.   Controlled

substances are scheduled into these levels based upon their potential for abuse, among other

things.   Buprenorphine is a Schedule III controlled substance.   Clonazepam is a Schedule IV controlled substance.

2.      Title 21, United States Code, Section 841(a) (1), provides that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance."

3.      Title 21, United States Code, Section 802(10), provides that the term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for delivery.

4.      Title 21, United States Code, Section 821, provides that "[t]he Attorney General [of the United States] is authorized to promulgate rules and regulations relating to the registration and control of the manufacture, distribution and dispensing of controlled substances."

5.      The Attorney General of the United States has exercised his rulemaking authority regarding the dispensing of controlled substances through the promulgation of Title 21, Code of Federal Regulations, Section 1306.04, governing the issuance of prescriptions, which provides, among other things, that a prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.   Moreover, an order purporting to be a prescription issued not in the usual course of professional treatment is not a prescription within the meaning and intent of section 309 of the Act [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as

well as the person issuing it, shall be subject to the penalties provided for violations of the law

relating to controlled substances.

6.      The Pennsylvania Code of Professional and Vocational Standards, Title 49,

Chapter 16.92, defines the authority of physicians licensed by the Commonwealth of Pennsylvania

to prescribe or dispense controlled substances.   Chapter 16.92 provides in pertinent part:

(a)      A person licensed to practice medicine and surgery in this
Commonwealth or otherwise licensed or regulated by the Board, when prescribing,
administering or dispensing controlled substances, shall carry out, or cause to be
carried out, the following minimum standards:

(1)      Initial medical history and physical examination....
[B]efore commencing treatment that involves prescribing, administering or
dispensing a controlled substance, an initial medical history shall be taken and an
initial examination shall be conducted unless emergency circumstances justify
otherwise.   Alternatively, medical history and physical examination information
recorded by another health care provider may be considered if the medical history
was taken and the physical examination was conducted within the immediately
preceding thirty days.   The physical examination shall include an evaluation of the
heart, lungs, blood pressure and body functions that relate to the patient's specific
complaint.

(2)      Reevaluations.   Among the factors to be considered in
determining the number and the frequency of follow-up evaluations that should be
recommended to the patient are the condition diagnosed, the controlled substance
involved, expected results and possible side effects.   For chronic conditions,
periodic follow-up evaluations shall be recommended to monitor the effectiveness
of the controlled substance in achieving the intended results.

(3)      Patient counseling.   Appropriate counseling shall be given
to the patient regarding the condition diagnosed and the controlled substance
prescribed, administered or dispensed.   Unless the patient is in an inpatient care
setting, the patient shall be specifically counseled about dosage levels, instructions
for use, frequency and duration of use and possible side effects.

(4)      Medical Records.   [C]ertain information shall be recorded
in the patient's medical record on each occasion when a controlled substance is
prescribed, administered or dispensed.   This information shall include the name of
the controlled substance, its strength, the quantity and the date it was prescribed,
administered or dispensed to a patient.   The medical record shall also include a
specification of the symptoms observed and reported, the diagnosis of the condition
for which the controlled substance is being given and the directions given to the

-3-

patient for the use of the controlled substance.   If the same controlled substance continues to be prescribed, administered or dispensed, the medical record shall reflect changes in the symptoms observed and reported, in the diagnosis of the condition for which the controlled substance is being given and in the directions given to the patient.

**B.    Medications**

7.    Suboxone is a brand name for a drug used to treat opiate addiction.   Suboxone contains a mixture of buprenorphine and naloxone.   Buprenorphine is a Schedule III controlled substance.   However, Suboxone can be used recreationally by crushing and snorting to produce a "high".   Suboxone also can be dissolved and injected intravenously for a similar euphoric effect. Suboxone can be used by long-time heroin addicts to increase the euphoric effects of heroin. Over time, the euphoric effect of heroin diminishes as the users' tolerance level increases.   For some longtime users, taking heroin only makes them feel "normal" – it does not produce the rush or the euphoric effect they experienced when they began using heroin.   One strategy to reproduce that euphoric effect is to take Suboxone for a few weeks and abstain from heroin.   This reduces the user's tolerance of heroin.   When the user then takes heroin again, the euphoric effect is magnified.   Some users call this strategy seeking a "virgin high" as a way to describe the euphoric effect of the high as comparable to the rush they felt when they first tried heroin.   This strategy is highly dangerous and can easily lead to overdose and death.

8.    Klonopin is a brand name of the drug clonazepam. Clonazepam is in the benzodiazepine class of tranquilizers.   Klonopin is typically orally ingested to treat anxiety and seizure disorders by altering certain chemicals in the brain.   When used recreationally, typically in combination with other drugs or alcohol, Klonopin can create euphoria or drowsiness depending on the methods used.   Because of the way it alters the brain, Klonopin may also cause suicidal or

homicidal thoughts in some people, and it may cause the user to engage in risky or dangerous behaviors.

9.      In recent years, law enforcement has seen a large increase in the recreational use of prescription medicine such as Suboxone and Klonopin.   Suboxone is typically sold on the street for $10 to $15 per dose.   Klonopin is typically sold on the street for $2 to $5 per pill.

10.      The combination of taking large doses of Suboxone and Klonopin is highly dangerous.   Suboxone is an opioid drug which slows a person's breathing, especially in larger doses.   Klonopin can cause a person to be drowsy.   Taking these drugs in combination, especially in large doses or by users not following the appropriate dosages, can result in death if a person stops breathing while asleep or incapacitated.

### C.      DATA-Waived Physicians

11.      Most drug treatment centers were highly regulated by federal and state authorities. However, these regulations impacted the ability of family doctors to treat their regular patients who acquired a substance abuse problem.   For this reason, on October 17, 2000, Congress passed the Drug Addiction Treatment Act (DATA) which permits qualified physicians to treat a limited number of drug addicts with narcotic controlled substances which have been approved by the Food and Drug Administration (FDA) for that indication.   The legislation waived the requirement for obtaining a separate Drug Enforcement Administration (DEA) registration as a Narcotic Treatment Program (NTP) for qualified physicians administering, dispensing, and prescribing these specific FDA approved controlled substances.

12.      Physicians registered with the DEA as practitioners who apply and were qualified pursuant to DATA were issued a waiver and were authorized to conduct maintenance and detoxification treatment using specifically approved schedule III, IV, or V narcotic medications.

-5-

DATA waivers are only granted to qualified physicians.   Physicians can initially apply to treat 30 patients and can later apply to treat as many as 100 patients.   In order to receive a DATA waiver, physicians must attend a training course which educates them on the dangers involved in treating drug addicts.

> **D.** **SAMHSA Training**

13.     In order to become a DATA-waived physician, each doctor had to become qualified.   One way to become qualified was to take a course by the U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration (SAMHSA). The SAMHSA training materials provided each DATA-waived physician with an overview of DATA and buprenorphine treatment generally.   The training materials listed the side-effects of buprenorphine treatment including nausea, vomiting, constipation, sedation, and liver problems.

14.     The SAMHSA training materials specifically discussed the risk of diversion and misuse.   DATA-waived physicians were taught that there were four high risk groups for diversion: (1) patients physically dependent on opioids, (2) patients prescribed opioids, (3) patients maintained on buprenorphine/naloxone, and (4) patients abusing, but not physically dependent on opioids.   Physicians were taught the specific ways in which patients might abuse buprenorphine.   Due to the risk of diversion, physicians were taught that the induction required closely supervised clinical monitoring.

15.     The SAMHSA training materials provided physicians with specific instructions for the induction stage.   The physicians were taught to instruct patients to abstain from any opioid use for 12 hours prior so they were in mild to moderate withdrawal at the time of the first buprenorphine dose.   The physicians were to track and document the patients' withdrawal scale. Axiomatically, the training materials specifically provide that if the physician did not observe any

withdrawal symptoms, the physician should instruct the patient to wait in the office until they appear or return the next day.

16.     The SAMHSA training materials instructed physicians that the first dose of buprenorphine should only be 2 to 4 milligrams.   The physicians must then monitor the patient for up to 2 hours after first dose.   If withdrawal symptoms occur, the physician could give another dose of buprenorphine or other medications to ease withdrawal symptoms.   The SAMHSA training materials stated that no more than 8 milligrams of buprenorphine should be administered on the first day.   For patients who are not physically dependent on opioids, the induction dose should be at the lower end of the spectrum, typically 2 milligrams of buprenorphine.

17.     The SAMHSA training materials also described how physicians should interview new patients.   The physicians should ask the patients about their history of drug use including the amount, frequency, and route.   The physicians should inquire about the patients' mental health history, socio-economic conditions, and any pertinent family history.   The physicians should physically examine the patient for signs of illegal drug use.   The physicians should discuss prior attempts to abstain or seek treatment and assess whether the patients are abusing other substances. The physicians should discuss with their patient the consequences of their drug use, such as medical, family, employment, legal, and psychiatric.   The physicians should review the Diagnostic and Statistical Manual of Mental Disorders criteria in order to diagnose a patient with opioid dependence.   The SAMHSA training materials stressed the importance of both a physical examination and a mental health examination of each patient.

18.     The SAMHSA training materials further provide that patients should then return to the office on the second day for assessment and proper dosing.   The physician should adjust the dosing according to the patient's needs.   The physician should adjust the dosage by 2 to 4

milligrams to find the correct dosage for each patient.   The average daily dose should be

somewhere between 12 and 16 milligrams.

19.     The SAMHSA training materials also discussed the fact that the majority of new

patients express symptoms of anxiety and depression.   The training materials indicate that these

were common symptoms of opioid dependence and that the "symptoms often resolve within a few

days" of substance abuse treatment.   The materials specifically warned against prescribing

benzodiazepines (such as Klonopin) due to the risk of abuse and possible dangerous interactions

with the buprenorphine.

20.     The SAMHSA training materials also provided a specific training module on urine

testing.   The training materials stated that the clinical rationale for urine drug testing is based on

the understanding that drug abuse is a chronic disorder and that relapse in drug use can, and often

does, occur, especially early in the treatment process.   Urine testing provides an objective means

for determining if drug use is occurring.   Urine testing should be viewed as an integral part of the

initial evaluation (as a means to confirm opioid use) and as part of ongoing evaluation and

treatment.   Urine testing should be viewed as a means for helping the physician to help the

patient.   Testing is not meant to "catch" the patient, and a positive test result should not simply

lead to discharge from treatment.   Ideally, urine specimens should be collected under monitored

conditions because opioid-dependent persons may attempt to give adulterated or substituted

specimens.   Urine should be collected in a room where samples cannot be diluted or otherwise

adulterated and where patients are not permitted to bring briefcases, backpacks, purses, or

containers of any sort.   Direct observation of the collection should be done by a same sex staff

member.   If not observed directly, consider using collection cups with built-in

temperature-sensitive strips to minimize the possibility of false or adulterated urine specimens.

Alternately, the pH and specific gravity of samples can be checked (to ensure that samples have not been diluted).   If tampering with samples is suspected and observed collection is not possible, use another method of verifying the sample.

      **E.**    **Manufacturer's Guidelines**

21.    The manufacturer of Suboxone also provided guidelines for physicians to follow when prescribing Suboxone.   In the prescribing information, the manufacturer stated that the range of effective dose is 4 mgs to 24 mgs.   The manufacturer suggested that the Suboxone dose should be progressively adjusted by 2 mg to a level that holds the patient in treatment and suppresses opioid withdrawal signs and symptoms.   The manufacturer stated that Suboxone treatment should be initiated with supervised administration progressing to unsupervised administration as to the patient's clinical stability permits.   Patients should be seen weekly during the first month of treatment.   Periodic assessment is necessary to determine compliance with the dosing regimen, effectiveness of treatment plan, and overall patient progress.

22.    The manufacturer provided the following warnings about Suboxone:

    a.    Buprenorphine can be abused in a similar manner to other opioids. Clinical monitoring appropriate to the patient's level of stability is essential. Multiple refills should not be prescribed early in treatment or without appropriate patient follow-up visits.

    b.    Significant respiratory depression and death have occurred in association with buprenorphine, particularly when taken in combination with benzodiazepines (Klonopin) or other central nervous system depressants (such as alcohol).

-9-

    c.       Chronic administration of Suboxone produces opioid-type physical dependence.

    d.       Physicians should monitor liver function tests prior to initiation and during treatment and evaluate suspected hepatic events.

    e.       Physicians should caution patients about the risk of driving or operating hazardous machinery.

    f.       Patients who are opioid naïve can die from as little as a 2 mg dose of Suboxone.

23.     The manufacturer specifically warned physicians of the risk that Suboxone may be abused and is subject to criminal diversion.   The manufacturer further stated that if the patients cannot abstain from illicit drug and alcohol use, the physician should re-evaluate the appropriateness of the Suboxone treatment.   The manufacturer stated that patients who continue to misuse, abuse, or divert Suboxone should be provided with or referred to more intensive and structured treatment.

24.     The manufacturer also advised physicians to watch for adverse reactions to Suboxone.   The most common adverse reactions include oral hypoesthesia (numbness), glossodynia (burning), oral mucosal erythema (reddening), headache, nausea, vomiting, hyperhidrosis (excess sweating), elevated brain/spinal fluid pressure, and constipation.   The manufacturer stated that long-term side effects included analgesia (loss of ability to feel pain), sedation, miosis (excessive restriction of the pupil of the eye), and respiratory depression.   The manufacturer stated that their research found that the higher the dose of Suboxone, the higher the opioid-like effects.   The manufacturer noted that the common symptoms of withdrawal included insomnia, pain, and peripheral edema (accumulation of fluid).   The manufacturer stated that

physicians should monitor patients for over or under dosing.   The manufacturer materials also stated that it is essential that the patient receive ongoing counseling and emotional support.

25.     Finally, the manufacturer provided specific warnings for certain types of patients. The manufacturer noted that physicians should use caution in prescribing Suboxone for patients receiving benzodiazepines (such as Klonopin) or other central nervous system depressants.   The manufacturer stated that physicians must warn patients against concomitant self-administration/misuse.   The manufacturer warned that Suboxone is not indicated for use during pregnancy and warned that breast feeding is not advised while taking Suboxone because buprenorphine passes into the mother's milk.   The manufacturer instructed doctors to be cautious when prescribing Suboxone to patients with liver dysfunction and to elderly or debilitated patients.

### E.     Roles of the Defendants

26.     Defendant CLARENCE VERDELL was registered under the provisions of the Controlled Substances Act, U.S.C. § 822(2) and 21 U.S.C. § 823(g) et seq. as a practitioner for the purpose of handling controlled substances in Schedules II through V.   Defendant VERDELL was licensed by the Commonwealth of Pennsylvania to practice medicine until his license was revoked in 2014 after DEA executed a search warrant at his office.

27.     Defendant CLARENCE VERDELL nominally operated a substance abuse treatment clinic in Philadelphia which prescribed Suboxone and Klonopin.   His clinic has operated at several different locations in Philadelphia, including 2326 South 12th Street, 4949 Frankford Avenue, 4606 Frankford Avenue, and 1813 Hilton Street.   Defendant VERDELL's clinic was a controlled premise within the meaning of 21 U.S.C. § 880(a)(1) and (2), and 21 C.F.R. § 1316.02(c)(1) and (2).   Defendant VERDELL was required to keep complete and accurate records of all controlled substances received, sold, delivered, dispensed, or otherwise disposed of

by him pursuant to 21 U.S.C. § 827 and 21 C.F.R. § 1304.01 et seq.   During the course of the conspiracy, defendant VERDELL employed approximately five doctors working at his clinic.

28.     On February 12, 2012, defendant CLARENCE VERDELL requested a DATA waiver and was issued UIN XV3522035 by DEA, authorizing him to administer, dispense and prescribe Schedule III narcotic controlled substances, namely buprenorphine drug products, for use in the maintenance and detoxification treatment of his customers.   This meant that he had the authority to administer, dispense, and prescribe buprenorphine products up to 30 patients each for the purpose of treating substance abuse issues.   On April 18, 2013, defendant VERDELL requested and was authorized by DEA to administer, dispense, and prescribe buprenorphine products up to 100 patients to treat their substance abuse issues.

29.     Defendant ROCHELLE WILLIAMS-MORROW worked as the office manager for defendant CLARENCE VERDELL's clinic.   Defendant WILLIAMS-MORROW was not licensed to practice medicine.   Defendant WILLIAMS-MORROW worked under a profit-sharing agreement with defendant VERDELL in which she received a percentage of the profits of the clinic.

**THE CONSPIRACY**

30.     From on or about February 12, 2012, through the date of this indictment, in the Eastern District of Pennsylvania, defendants

**CLARENCE VERDELL and
ROCHELLE WILLIAMS-MORROW**

conspired and agreed, together and with and others known and unknown to the grand jury, to knowingly and intentionally distribute and dispense, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable

amount of buprenorphine, commonly known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, commonly known as Klonopin, a Schedule IV controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2).

## MANNER AND MEANS

31.     Defendant CLARENCE VERDELL ran a clinic in Philadelphia, sometimes called "Soulutions in Recovery," which nominally provided substance abuse treatment.   In reality, defendant VERDELL and the other doctors who worked at his clinic sold prescriptions for controlled substances to drug dealers and drug addicts in exchange for cash payments and performed little or no medical or mental health treatment.   Defendant VERDELL did not perform medical or mental health examinations of his customers as required by law.   Virtually every customer who visited defendant VERDELL's clinic received the maximum daily doses of Suboxone and Klonopin regardless of the customer's medical or mental health history.

32.     Defendant CLARENCE VERDELL's clinic usually sold controlled substances to several hundred customers per month.   Under the terms of his DATA-waiver, defendant VERDELL was legally permitted to provide substance abuse treatment to no more than 100 patients.   Defendant VERDELL typically employed two to five doctors at his clinic to assist him in dispensing the controlled substances.   Neither defendant VERDELL nor any of the other doctors employed at his practice conducted medical examinations or mental health examinations of the customers prior to prescribing controlled substances as required by law.

33.     Defendant CLARENCE VERDELL failed to follow the standard of care in purportedly treating substance abuse by:

            a.       Failing to perform medical examinations;

-13-

b.      Failing to perform mental health examinations;

c.      Failing to obtain adequate medical and mental health histories from patients;

d.      Failing to ensure that patients being prescribed Suboxone were not pregnant;

e.      Failing to follow the Diagnostic and Statistical Manual of Mental Disorders criteria in order to diagnose a patient with opioid dependence;

f.      Failing to properly assess patients for other substance abuse;

g.      Failing to administer proper urine and blood tests to ensure the suitability of treatment;

h.      Failing to follow proper procedures in collecting urine samples;

i.      Ignoring the results of urine tests;

j.      Failing to observe opioid withdrawal symptoms before prescribing Suboxone;

k.      Failing to follow proper Suboxone induction treatment procedures;

l.      Failing to induce withdrawals symptoms before administering Suboxone;

m.      Failing to properly monitor patients after prescribing Suboxone;

n.      Failing to titrate the effective dose of Suboxone for each patient;

o.      Prescribing more Suboxone than medically necessary;

p.      Indiscriminately prescribing Klonopin to patients when not medically necessary;

q.      Failing to counsel patients on the dangers of taking Suboxone and Klonopin together;

-14-

r.      Failing to provide licensed mental health professionals to patients;

s.      Failing to refer patients to more intensive in-patient or out-patient mental health treatment or substance abuse treatment when medically necessary;

t.      Ignoring evidence of diversion of the prescriptions; and

u.      Failing to taper doses of Suboxone and Klonopin over time.

34.     As a result, defendant CLARENCE VERDELL's clinic became well-known to drug dealers and drug addicts in Philadelphia and the surrounding area.   Drug dealers and drug addicts from Pennsylvania and New Jersey went to defendant VERDELL's clinic to obtain prescriptions for massive doses of Suboxone and Klonopin.   The drug dealers sold the Suboxone and Klonopin for a profit.   The drug addicts sold the Suboxone and Klonopin in order to buy heroin or other controlled substances.   Defendant VERDELL and other doctors working at defendant VERDELL's clinic routinely ignored drug tests which showed that their customers' urine was negative for the controlled substances which they had prescribed and positive for other controlled substances.   These urine tests were an unmistakable sign that defendant VERDELL's customers were diverting and selling the prescribed controlled substances.

35.     Customers to defendant CLARENCE VERDELL's clinic paid for the amount of drugs they wished to receive.   For a week's prescription of Suboxone and Klonopin, customers paid $45.   For a month's supply, customers paid $150.   The medical standard of care, or lack thereof, at defendant VERDELL's clinic did not change depending on the amount a customer paid. Defendant VERDELL's clinic only accepted U.S. currency as payment.   In other words, the customers to defendant VERDELL's clinic paid for prescriptions, not any medical or mental health treatment.

-15-

36.     Defendant CLARENCE VERDELL previously worked at a Suboxone and Klonopin clinic operated by Dr. Alan Summers, charged elsewhere.   After working for Summers's clinic for approximately six months, defendant VERDELL left Summers's clinic and opened his own clinic.   Defendant VERDELL recruited several of the office workers from Summers's clinic to work for defendant VERDELL's clinic, including defendant ROCHELLE WILLIAMS-MORROW.   Defendant VERDELL and defendant WILLIAMS-MORROW then recruited or attempted to recruit many of the customers at Summers's clinic.   Defendant VERDELL and defendant WILLIAMS-MORROW had a three-fold marketing strategy for luring Summers's customers: (a) defendant VERDELL charged only $150 per month while Summers charged $200 per month; (b) defendant VERDELL prescribed ninety Suboxone and ninety Klonopin doses per month to each customer while Summers prescribed only eighty-four Suboxone and eighty-four Klonopin doses per month; and (c) defendant VERDELL did not require any of his customers to attend group therapy or other substance abuse counseling while Summers required at least some of his patients to attend group therapy.

37.     In addition to hiring additional doctors to sign prescriptions for Suboxone and Klonopin, defendant CLARENCE VERDELL also provided prescription pads for defendant ROCHELLE WILLIAMS-MORROW and other office workers to use when defendant VERDELL was not present in the office.   Defendant WILLIAMS-MORROW and the other office workers used the prescription pads provided by defendant VERDELL to issue prescriptions to customers in defendant VERDELL's name.   Furthermore, certain doctors working at defendant VERDELL's clinic refused to sign Klonopin prescriptions and only signed the Suboxone prescriptions.   In those instances, either defendant VERDELL would sign the Klonopin prescriptions for those customers or defendant WILLIAMS-MORROW or another office worker would use the

-16-

prescription pads provided by defendant VERDELL to issue Klonopin prescriptions for those customers in defendant VERDELL's name.

38.     Between approximately August 2012 and approximately August 2014, defendant CLARENCE VERDELL prescribed approximately 567,000 Suboxone doses and approximately 762,000 Klonopin doses.

39.     Defendant CLARENCE VERDELL typically sold controlled substances to hundreds of customers per month each paying up to $150 per month.   Defendant VERDELL reaped substantial profits from the illegal sale of controlled substances.   Between 2010 and 2015, VERDELL deposited $1,056,091 in U.S. currency into his various bank accounts from the proceeds of the sale of controlled substances.   In addition, DEA agents seized $102,530 in U.S. currency in his home during the execution of a search warrant.   Therefore, the total traceable cash receipts for VERDELL amounted to $1,158,621.90.

40.     During the course of the investigation, DEA sent healthy undercover law enforcement officers and other agents posing as customers inside defendant CLARENCE VERDELL's clinic.   All were "diagnosed" with opioid dependency and other anxiety disorders. None were given a medical examination or mental health examination.   Some were given prescriptions without seeing a doctor on defendant VERDELL's instructions.   All were prescribed massive doses of Suboxone and Klonopin by defendant VERDELL and other doctors employed by defendant VERDELL.

41.     In August 2014, DEA executed search warrants on defendant CLARENCE VERDELL's clinic and home.   Defendant VERDELL's license to practice medicine was subsequently suspended.   Nonetheless, defendant VERDELL continued to manage and operate his clinic which continued to illegally dispense Suboxone and Klonopin.

**<u>OVERT ACTS</u>**

In furtherance of the conspiracy and to accomplish its object, defendants CLARENCE

VERDELL and ROCHELLE WILLIAMS-MORROW committed the following overt acts, among

others, in the Eastern District of Pennsylvania and elsewhere:

1.      On or about July 13, 2013, defendant ROCHELLE WILLIAMS-MORROW used a

prescription pad given to her by defendant CLARENCE VERDELL to issue prescriptions for

Suboxone and Klonopin to Customer #1.

2.      On or about July 13, 2013, defendant ROCHELLE WILLIAMS-MORROW used a

prescription pad given to her by defendant CLARENCE VERDELL to issue prescriptions for

Suboxone and Klonopin to Customer #2.

3.      On or about July 27, 2013, defendant CLARENCE VERDELL prescribed

Suboxone and Klonopin to Customer #1 outside the usual course of professional practice and not

for a legitimate medical purpose.

4.      On or about July 27, 2013, defendant CLARENCE VERDELL prescribed

Suboxone and Klonopin to Customer #2 outside the usual course of professional practice and not

for a legitimate medical purpose.

5.      On or about August 1, 2013, defendant CLARENCE VERDELL prescribed

Suboxone and Klonopin to Customer #3 outside the usual course of professional practice and not

for a legitimate medical purpose.

6.      On or about August 26, 2013, defendant CLARENCE VERDELL prescribed

Suboxone and Klonopin to Customer #3 outside the usual course of professional practice and not

for a legitimate medical purpose.

7.      On or about September 1, 2013, defendant ROCHELLE WILLIAMS-MORROW attempted to recruit Customer #6, then a customer at Dr. Alan Summers's clinic, to come to defendant CLARENCE VERDELL's clinic by promising Customer #6 that he would pay less money and would not have to attend any group therapy sessions if he left Summers's clinic and came to defendant VERDELL's clinic.

8.      On or about September 23, 2013, defendant CLARENCE VERDELL prescribed Suboxone and Klonopin to Customer #4 outside the usual course of professional practice and not for a legitimate medical purpose.

9.      On or about October 21, 2013, defendant CLARENCE VERDELL prescribed Suboxone and Klonopin to Customer #3 outside the usual course of professional practice and not for a legitimate medical purpose.

10.     On or about November 2, 2013, defendant CLARENCE VERDELL prescribed Suboxone and Klonopin to Customer #4 outside the usual course of professional practice and not for a legitimate medical purpose.

11.     On or about November 18, 2013, defendant CLARENCE VERDELL prescribed Suboxone and Klonopin to Customer #3 outside the usual course of professional practice and not for a legitimate medical purpose.

12.     On or about December 17, 2013, defendant CLARENCE VERDELL prescribed Suboxone and Klonopin to Customer #3 outside the usual course of professional practice and not for a legitimate medical purpose.

13.     On or about December 17, 2013, defendant CLARENCE VERDELL prescribed Suboxone and Klonopin to Customer #4 outside the usual course of professional practice and not for a legitimate medical purpose.

14.     On or about January 14, 2014, defendant CLARENCE VERDELL prescribed Suboxone and Klonopin to Customer #3 outside the usual course of professional practice and not for a legitimate medical purpose.

15.     On or about February 1, 2014, defendant CLARENCE VERDELL prescribed Suboxone and Klonopin to Customer #3 outside the usual course of professional practice and not for a legitimate medical purpose.

16.     On or about February 27, 2014, defendant CLARENCE VERDELL prescribed Suboxone and Klonopin to Cooperating Defendant #1 outside the usual course of professional practice and not for a legitimate medical purpose.

17.     On or about March 12, 2014, defendant CLARENCE VERDELL prescribed Suboxone and Klonopin to Undercover Agent #1 outside the usual course of professional practice and not for a legitimate medical purpose.

18.     On or about April 24, 2014, defendant CLARENCE VERDELL prescribed Suboxone and Klonopin to Cooperating Defendant #1 outside the usual course of professional practice and not for a legitimate medical purpose.

19.      On or about April 24, 2014, defendant CLARENCE VERDELL prescribed Suboxone and Klonopin to Undercover Agent #1 outside the usual course of professional practice and not for a legitimate medical purpose.

20.     On or about April 24, 2014, defendant CLARENCE VERDELL prescribed Suboxone and Klonopin to Undercover Agent #2 outside the usual course of professional practice and not for a legitimate medical purpose.

21.     On or about June 27, 2014, a doctor working under defendant CLARENCE VERDELL's direction prescribed Suboxone and Klonopin to Customer #5 outside the usual course of professional practice and not for a legitimate medical purpose.

22.     On or about July 24, 2014, a doctor working under defendant CLARENCE VERDELL's direction prescribed Suboxone to Undercover Agent #2 outside the usual course of professional practice and not for a legitimate medical purpose.

23.     On or about July 24, 2014, an office worker working under defendant CLARENCE VERDELL's direction handed Undercover Agent #2 a prescription for Klonopin purportedly signed by defendant CLARENCE VERDELL.

All in violation of Title 21, United States Code, Section 846.

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

   1. Paragraphs 1 through 29 and 31 through 41 and Overt Acts 1 through 23 of Count One are incorporated here.

   2. The Medicaid Program is a "healthcare benefit program" as defined by Title 18, United States Code, Section 24(b), in that it provides payment for health care services on behalf of eligible low-income individuals with limited income.   The Pennsylvania Medicaid Program is jointly funded by the U.S. Department of Health & Human Services and the Commonwealth of Pennsylvania.   The Medicaid Managed Care Organizations include Keystone Mercy/Keystone First, United HealthCare, HealthPartners, Aetna Better Health, AmeriHealth Caritas, and Coventry Cares.

   3. The Medicare program is a "healthcare benefit program" as defined by Title 18, United States Code, Section 24(b) in that it provides healthcare services, including prescription medications.   Individuals are eligible for Medicare benefits if they are 65 or older, have certain disabilities, or have end-stage renal disease.   The Medicare program is funded by the U.S. Department of Health & Human Services, Centers for Medicare and Medicaid Services. Medicare Part D is a federal program enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, effective 2006, to subsidize the costs of prescription drugs for Medicare beneficiaries.   Individuals are eligible for prescription drug coverage under a Part D plan if they are entitled to benefits under Medicare Part A and/or enrolled in Part B.   Beneficiaries can obtain the Part D drug benefit through two types of private plans: they can join a Prescription Drug Plan (PDP) for drug coverage only or they can join a Medicare Advantage plan that covers both medical services and prescription drugs.

4.      The Blue Cross and Blue Shield Association (BCBSA) is the national coordinating body for the federation of independent Blue Cross and Blue Shield plans. Blue Cross and Blue Shield plans contract with hospitals, physicians, and other health care providers to provide a variety of managed health care service insurance plans, including, insurance coverage for medically necessary prescriptions for their members.   The 38 independent companies that form the BCBSA are among the oldest and largest health insurers in the U.S., collectively covering more than 98 million people.   Independence Blue Cross (IBC) is one of these 38 independent licensees, and has been assigned a specific area to market its products, including, Bucks, Chester, Delaware, Montgomery, and Philadelphia counties in Pennsylvania.

5.      From on or about January 1, 2013, through the date of this indictment, in the Eastern District of Pennsylvania and elsewhere, defendants

**CLARENCE VERDELL and
ROCHELLE WILLIAMS-MORROW**

conspired and agreed, together and with others known and unknown to the grand jury, to knowingly and willfully execute a scheme to defraud health benefit programs as defined in Title 18, United States Code, Section 24(b), and to obtain money and property of health care benefit programs by means of false and fraudulent pretenses, representations, and promises, in connection with the delivery of and payment for health care benefits, items and services, violation of Title 18, United States Code Section 1347.

**MANNER AND MEANS**

It was part of the scheme that:

6.      As described in more detail in Count One, defendant CLARENCE VERDELL operated a substance abuse clinic in Philadelphia which illegally distributed controlled

-23-

substances.   Defendant VERDELL's clinic accepted only cash as payment for the prescriptions,

but did accept health insurance to pay for urine testing.   Defendant VERDELL's clinic also

submitted pre-authorization forms to customers' insurance companies so that the customers could

use insurance to pay to fill their prescriptions at the pharmacy.   Since many of defendant

VERDELL's customers received Medicaid benefits from the government, many of defendant

VERDELL's customers were able to fill their prescription with little or no out-of-pocket expenses.

Defendant VERDELL's office manager, ROCHELLE WILLIAMS-MORROW coordinated the

submission of the pre-authorization forms and supervised other office workers submitting the

pre-authorization forms.

       7.     To ensure that his customers received insurance coverage, defendant

CLARENCE VERDELL, ROCHELLE WILLIAMS-MORROW, and others working under their

direction knowingly submitted and caused other to submit false information to the insurance

companies.   This false information included assertions that: (1) customers had been consistently

using Suboxone when the laboratory reports showed they had not; (2) customers' urine tests were

negative for the presence of opiates when the laboratory reports showed they were positive; (3)

customers were attending substance abuse counseling when customers were in fact not attending

counseling, (4) customers were receiving substance abuse therapy from a licensed mental health

professional when they were not, (5) female customers had received pregnancy tests when no such

tests were performed, and (6) customers' urine tests were performed on dates when no such tests

were performed.

       All in violation of Title 18, United States Code, Section 1349.

-24-

## COUNT THREE

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about February 27, 2014, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### CLARENCE VERDELL

knowingly and intentionally distributed a mixture and substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, also known as Klonopin, a Schedule IV controlled substance, to Cooperating Defendant #1.

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2).

## COUNT FOUR

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about March 12, 2014, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### CLARENCE VERDELL

knowingly and intentionally distributed a mixture and substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, also known as Klonopin, a Schedule IV controlled substance, to Undercover Agent #1.

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2).

## COUNT FIVE

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about April 24, 2014, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### CLARENCE VERDELL

knowingly and intentionally distributed a mixture and substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, also known as Klonopin, a Schedule IV controlled substance, to Undercover Agent #1.

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2).

## COUNT SIX

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about April 24, 2014, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### CLARENCE VERDELL

knowingly and intentionally distributed a mixture and substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, also known as Klonopin, a Schedule IV controlled substance, to Undercover Agent #2.

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2).

## COUNT SEVEN

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about April 24, 2014, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### CLARENCE VERDELL

knowingly and intentionally distributed a mixture and substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, also known as Klonopin, a Schedule IV controlled substance, to Cooperating Defendant #1.

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2).

## COUNT EIGHT

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about July 24, 2014, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### CLARENCE VERDELL

knowingly and intentionally distributed, and aided and abetted the distribution of, a mixture and substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, also known as Klonopin, a Schedule IV controlled substance, to Undercover Agent #2.

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2) and Title 18, United States Code, Section 2.

## COUNTS NINE AND TEN

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.      Paragraphs 1 through 29 and 31 through 40 and Overt Acts 1 through 23 of Count One are incorporated here.

      2.      On or about the dates set forth below, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### CLARENCE VERDELL

knowingly engaged in a monetary transaction, and aided and abetted the engagement in a monetary transaction, affecting interstate commerce in criminally derived property of a value greater than $10,000, described more fully below, and such property was derived from a specified unlawful activity, that is conspiracy to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Sections 841 and 846.

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| Nine | March 13, 2014 | A $13,000 check from "Verdell Enterprises" to defendant CLARENCE VERDELL |
| Ten | April 3, 2014 | A $15,000 check from "Verdell Enterprises" to defendant CLARENCE VERDELL |

      In violation of Title 18, United States Code, Sections 1957 and 2.

## COUNTS ELEVEN AND TWELVE

**THE GRAND JURY FURTHER CHARGES THAT:**

       1.     Paragraphs 1 through 29 and 31 through 40 and Overt Acts 1 through 23 of Count One are incorporated here.

       2.     From on or about January 1, 2013 through the date of this indictment, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### CLARENCE VERDELL

knowingly and willfully executed, and aided and abetted the execution of, a scheme and artifice to defraud a health care benefit program, that is, Keystone Mercy/Keystone First, United HealthCare, HealthPartners, Aetna Better Health, Coventry Cares, AmeriHealth Caritas, and Independence Blue Cross, and to obtain money and property owned by and under the custody and control of that health care benefit program, by means of false and fraudulent pretenses, representations, and promises, in connection with the delivery of/payment for health care benefits, items and services, by providing false information on pre-authorization forms for customers seeking health care benefits for prescriptions for Suboxone and Klonopin which were issued outside the usual course of professional practice and not for a legitimate medical purpose, on or about the dates below, each date constituting a separate count:

| Count | Approximate Date of Pre-Authorization Submission | Customer | Health Care Benefit Program |
|-------|--------------------------------------------------|----------|-----------------------------|
| 11 | June 2, 2014 | Customer #4 | AmeriHealth Caritas |
| 12 | June 26, 2014 | Customer #3 | Keystone First |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## NOTICE OF FORFEITURE No. 1

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.    As a result of the violations of Title 21, United States Code, Sections 846 and 841(a)(1) as set forth in this indictment, defendant

**CLARENCE VERDELL, and**
**ROCHELLE WILLIAMS-MORROW**

shall forfeit to the United States of America:

      (a)    any property used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offense;

      (b)    any property constituting, or derived from, proceeds obtained directly or indirectly from the commission of such violations, including, but not limited to:

      (i)    a sum of at least $1,158,621.90; and

      (ii)    $102,530 in United States Currency seized by agents from the Drug Enforcement Agency ("DEA") on August 22, 2014 from the residence of defendant CLARENCE VERDELL.

      2.    If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

      (a)    cannot be located upon the exercise of due diligence;

      (b)    has been transferred or sold to, or deposited with, a third party;

      (c)    has been placed beyond the jurisdiction of the Court;

      (d)    has been substantially diminished in value; or

      (e)    has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States

Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property subject to forfeiture.

All pursuant to Title 21, United States Code, Section 853.

## NOTICE OF FORFEITURE No. 2

**THE GRAND JURY FURTHER CHARGES THAT:**

          1.     As a result of the violation of Title 18, United States Code, Section 1957 set forth in this indictment, defendants

### CLARENCE VERDELL

shall forfeit to the United States of America any property, real or personal, involved in such violation, and any property traceable to such property.

          2.     If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

          (a)     cannot be located upon the exercise of due diligence;

          (b)     has been transferred or sold to, or deposited with, a third party;

          (c)     has been placed beyond the jurisdiction of the Court;

          (d)     has been substantially diminished in value; or

          (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property subject to forfeiture.

          All pursuant to Title 18, United States Code, Section 982.

## NOTICE OF FORFEITURE No. 3

**THE GRAND JURY FURTHER CHARGES THAT:**

       1.     As a result of the violations of Title 18, United States Code, Sections 1347 and 1349 as set forth in this indictment, defendants

**CLARENCE VERDELL and
ROCHELLE WILLIAMS-MORROW**

shall forfeit to the United States of America any property that constitutes or is derived from gross proceeds traceable to the commission of such offenses.

       2.     If any of the property subject to forfeiture, as a result of any act or omission of the defendant(s):

       (a)     cannot be located upon the exercise of due diligence;

       (b)     has been transferred or sold to, or deposited with, a third party;

       (c)     has been placed beyond the jurisdiction of the Court;

       (d)     has been substantially diminished in value; or

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant(s) up to the value of the property subject to forfeiture.

       All pursuant to Title 18, United States Code, Section 982(a)(7).

**A TRUE BILL:**

_____
**GRAND JURY FOREPERSON**

_____
**ZANE DAVID MEMEGER**
**United States Attorney**

-36-